# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**HOLLY J. SZYMCZAK,**

    **Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

Civil Action 2:20-cv-5909
Judge Michael H. Watson
Magistrate Judge Chelsey M. Vascura

## REPORT AND RECOMMENDATION

Plaintiff, Holly J. Szymczak ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits ("DIB"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 19), the Commissioner's Memorandum in Opposition (ECF No. 23), and the administrative record (ECF No. 12). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's determination.

    **I.**    **BACKGROUND**

Plaintiff protectively filed her DIB application on June 27, 2017, alleging that she became disabled on March 16, 2017. (R. at 27, 255–56.) Plaintiff's application was denied at the initial level in January 2018 (R. at 150–58, 159), and at the reconsideration level in May 2018 (R. at 160–72, 173). A video hearing was held on August 15, 2019, before Administrative Law Judge Deborah M. Giesen (the "ALJ"), at which Plaintiff, accompanied by a non-attorney consultant, appeared and testified. (R. at 53–93.) On September 30, 2019, the ALJ issued an

unfavorable determination. (R. at 24–49.) On September 16, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final determination. (R. 1–7.) Plaintiff timely commenced the instant action seeking judicial review of the Commissioner's final determination. (ECF No. 1.)

In her Statement of Errors (ECF No. 19), Plaintiff asserts that the ALJ's residual functional capacity determination is not supported by substantial evidence. Specifically, Plaintiff alleges that the ALJ should have determined that Plaintiff was more restricted with regard to her upper left extremity. The undersigned concludes that Plaintiff's contention of error lacks merit.

## II. THE ALJ's DECISION

On September 30, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 24–49.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023. (R. at

29.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 16, 2017, her alleged date of onset. (*Id.*) At step two, the ALJ found that Plaintiff had the following severe impairments: morbid obesity; disc degenerative disease of the lumbar and cervical spine; left upper extremity proximal median neuropathy; right hand degenerative joint disease; bilateral peroneal tendonitis; bilateral tarsal tunnel syndrome; fibromyalgia; and osteoarthritis in her hands, feet, and knees. (R. at 30.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32.)

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[2] as follows:

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the [Plaintiff] is limited to no more than occasionally climbing ramps/stairs, balancing, or stooping; never kneeling, crouching, crawling or climbing ladders/ropes/scaffolds; never working around unprotected heights, open flames, or unprotected dangerous machinery; no more than occasionally reaching overhead bilaterally; no more than frequently handling/fingering bilaterally; and accommodating for use of a cane for walking more than 50 feet.

(R. at 33.)

At step four, the ALJ relied on testimony from a vocational expert ("VE") to find that Plaintiff was unable to perform her past relevant work. (R. at 42.) At step five, the ALJ again relied on testimony from a VE to determine that in light of Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (R. at 42–43.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act, since March 16, 2017, the alleged onset date. (R. at 43.)

### III. RELEVANT RECORD EVIDENCE[3]

**A. Plaintiff's Testimony**

At the September 25, 2019 hearing, Plaintiff testified to the following facts. Plaintiff is right-handed. (R. at 69–70.) Plaintiff had arthroscopic surgery on her left shoulder on March 16, 2017. (R. at 63.) After that surgery, Plaintiff did not return to work as a finishing operator at a General Electric Factory. (*Id*.) Instead, she went on short-term, and then long-term, disability. (R. at 64–65.) The main areas where Plaintiff had pain and limitations were her low back, neck, and her right foot. (R. at 76.) Her neck pain caused her to have headaches and a lot of shoulder pain in both shoulders. (R. at 77–78.)

---

[3] Because Plaintiff's contention of error pertains to her left upper extremity, the undersigned focuses her discussion on the same.

Plaintiff's left thumb and index finger were also completely numb, and she had constant swelling, tightness, and tingling in her right hand. (R. at 79–80.) She had a hard time lifting, grasping, and using her hands for fine manipulation. (R. at 80.) Plaintiff was unable put her bra on by herself because of her shoulders and hands and could not bend over to tie her shoes because her hands were kind of numb. (R. at 80–81.) For those reasons, Plaintiff's daughters helped her with those elements of getting dressed. (R. at 80.) Plaintiff had trouble lifting a gallon of milk an estimated that the heaviest amount she could lift was five pounds. (R. at 81.) Plaintiff did dishes daily, but that task took her roughly an hour and a half to complete because work like that hurt her neck and shoulders. (R. at 83.) Plaintiff would get up and let her dogs outside her one-story residence. (R. at 83–84.) Plaintiff would try to use a sweeper to sweep an area rug in her living room and her daughters helped her with that. (R. at 84.) She could go downstairs to do laundry but could not carry it down. (*Id*.) Her daughters also assisted her with carrying laundry. (*Id*.)

Plaintiff had a driver's license and drove herself in a minivan maybe an hour or so a day if she needed to go to the store. (R. at 71.) Plaintiff had a smart phone that she used to access the internet and pay bills, read a Bible app daily, and on rare occasions, access her Facebook and Instagram accounts. (*Id*.) She checked her teenaged daughter's social media accounts, however, on a daily basis. (R. at 72–73.) Plaintiff also used her phone for texting. (R. at 73.)

**B.     Treatment Records**

    **1.     Plaintiff's Left Shoulder**

The record reflects that Plaintiff presented with a new complaint of left shoulder pain on September 26, 2016, which was prior to the alleged date of onset. (R. at 449.) At that time, she was diagnosed with left rotator cuff tendinitis with partial thickness tearing of the rotator cuff.

5

(*Id*.)  It was noted that Plaintiff might be a candidate for left shoulder diagnostic arthroscopy with debridement.  (R. at 450.)

Plaintiff had surgery (arthroscopy) in March 2017.  (R. at 594, 669.)  Post-surgical examinations in 2017 found that Plaintiff was neurovascularly intact distally in her left upper extremity.  (R. at 431, 433, 435, 437, 439, 441.)  Plaintiff also had multiple well healed arthroscopic portals about her left shoulder.  (*Id*.)   But Plaintiff had forward rounded posture.  (*Id*.)  She also had some tenderness anteriorly over the long head of her biceps and anterolaterally over Codman's point during some 2017 examinations.  (R. at 431, 433.)

On March 27, 2017, Plaintiff reported a 40% improvement in her symptoms.  (R. at 441.)  On May 1, 2017, Plaintiff reported a 60% improvement in her symptoms.  (R. at 439.)  An examination of Plaintiff's extremities on May 3, 2017, found that Plaintiff had full range of motion of all joints.  (R. at 641.)  On June 5, 2017, Plaintiff reported that her shoulder was "getting there" albeit slowly.  (R. at 437.)  On July 10, 2017, Plaintiff reported that she had an estimated 75% improvement in her left shoulder symptoms overall although it had not improved to the extent or at the pace she had hoped or anticipated.  (R. at 435.)  Plaintiff was also advised about the importance of resuming therapy, improving her posture and scapular mechanics, and staying on a home exercise program.  (R. at 436.)  On August 28, 2017, Plaintiff reported that her left shoulder was slowly improving.  (R. at 433.)  Examinations during the July and August appointments found that Plaintiff had near full active and passive ranges of motion in the left shoulder.  (R. at 433, 435.)  At an examination of Plaintiff's extremities on September 15, 2017, Plaintiff had full range of motion of all joints.  (R. at 558.)

On October 9, 2017, Plaintiff reported that although she was on permanent disability for her back, she was looking for part-time work.  (R. at 431.)  She also described generalized "achy

soreness," but her shoulders were "not that bad anymore." (*Id.*) An examination that day found that Plaintiff could elevate to 150–155 degrees on the left and 160 degrees on the right. (*Id.*) In addition, her external rotation was 20–25 degrees on the left and 25–30 degrees on the right and her internal rotation was to T9 on the left and to T7 on the right. (*Id.*) Plaintiff could get her left hand behind her head with external rotation on the left. (*Id.*) Plaintiff's rotator cuff strength was 5- with resisted forward elevation and abduction, and her resisted external rotation with her arm at her side was a 5- to a 5/5 with early fatigue. (*Id.*) Plaintiff received an injection and was advised to maintain her home exercise program. (R. at 431–32.)

Examinations of Plaintiff's extremities on January 29, March 5, and October 23, 2018, found that Plaintiff had full range of motion of all joints. (R. at 583, 571, 1177.) On September 12, 2018, Plaintiff scored 5 on motor tests of her right and left shoulder abduction. (R. at 1238–39.) Examinations on July 18, and December 14, 2018, and June 19, 2019, found that Plaintiff had good strength in her shoulder stabilizers. (R. at 824, 826, 1518.)

2.  **Plaintiff's Hands and Arms**

Plaintiff had median nerve decompression in her left forearm and pronator release surgery on November 28, 2016, which was prior to the alleged date of onset. (R. a 443, 446, 447.)

During examinations on September 27, and December 22, 2017, Spurling tests were positive for left arm pain, but Plaintiff's muscle strength was 5/5 in the upper extremity. (R. at 471, 475.) Plaintiff was prescribed a six-week home exercise program. (R. at 472, 476.)

On January 30, 2018, Plaintiff reported localized pain in her right index finger DIP joint and some pain around her right CMC joint of her thumb. (R. at 544.) Bilateral x-rays of her hands showed no acute process but showed foreign bodies in the second and fourth digits. (R. at

7

546.) Plaintiff did not complain, however, about pain in the areas of the foreign bodies. (*Id.*) X-rays also showed osteoarthritic flareup of the second DIP joint and CMC joint of the thumb on her right hand. (*Id.*) Plaintiff received steroid injections in both joints. (R. at 547.)

On February 19, 2018, Plaintiff sought treatment for bilateral hand pain and dysfunction in her left thumb. (R. at 539.) It was noted that she had prior multiple carpal tunnel syndrome surgeries. (*Id.*) Upon examination, Plaintiff had normal range of motion of joints in the hand and wrist passively with the left thumb. (*Id.*) She also was negative for shift grind in both of her first CMC joints and both of her index MP joints. (*Id.*) Her sensibility was mildly diminished on the left in the median distribution. (*Id.*) Her capillary refill and intrinsic and extrinsic motor function were normal with the exception of the FPL on her left, which showed no active contraction. (*Id.*) She had a well healed scar at the MP flexion crease, but she was not capable of independently firing from the FDS tendons. (*Id.*)

An examination on March 5, 2018, found that Plaintiff had tenderness along the first DIP joint of the index finger and proximal MCP joint of the right hand. (R. at 583.) But no swelling of the hand joints was noted. (*Id.*)

On March 15, 2018, an examination noted that Plaintiff had a degree of volar muscle atrophy. (R. at 818.) Plaintiff also had weakness of the long median flexors of the hand as well as significant APB weakness and profound weakness of the left thumb flexor. (*Id.*) She appeared to have a mild degree of weakness on the left also affecting the ulnar-innervated muscles and the digit extensors to some extent. (*Id.*) In contrast, she had she had normal strength throughout the right upper limb. (*Id.*) Plaintiff reflexes in her left bicep were decreased, and her biceps brachii muscle could not be palpitated. (*Id.*) Plaintiff had noticeably decreased supination. (*Id.*) Plaintiff also had a sensory deficit in the distal volar aspect of her left thumb

8

but no such deficit elsewhere.  (*Id*.)  Plaintiff had no edema and good distal pulses.  (*Id*.)  Findings from an electrodiagnostic study done that day were consistent with a severe left proximal median neuropathy proximal to the innervation of the pronator teres.  (*Id*.)  Changes in the C8-innervated muscles raised the question of whether there was a concomitant cervical radiculopathy or brachial plexopathy of the inferior trunk.  (*Id*.)  It was noted that results from a cervical MRI were pending but that further testing including an MRI of the brachial plexus and ultrasound imaging of her median nerve and forearm might be reasonable.  (*Id*.)

On April 3, 2018, an examination found that Plaintiff had neuritis in her left index finger with itching and irritation.  (R. at 790.)  Plaintiff was prescribed lidocaine topical cream.  (*Id*.)

On May 24, 2018, an ultrasound of Plaintiff's median, ulnar, and radial nerves upper limb nerves showed that Plaintiff had profound denervation of the left biceps brachii and brachialis, and significant denervation of the median and ulnar-innervated muscles of the forearm with hypoechoic signal change and atrophy.  (*Id*.)  The findings were consistent with chronic left median neuropathy with profound denervation of those muscles.  (R. at 822.)  In addition, the findings suggested a proximal lesion.  (*Id*.)  Her neurologic pattern was described as significantly confusing.  (*Id*.)  An MRI of the brachial plexus was again recommended.  (*Id*.)

During an examination on June 6, 2018, a Spurling test was positive for arm pain.  (R. at 1016.)  Her pain was reproduced in the left arm.  (*Id*.)  Plaintiff's muscle strength was, however, 5/5 in the upper extremity.  (*Id*.)

On July 18, 2018, it was noted that MRIs of Plaintiff's cervical spine, brachial plexus, and chest region were unremarkable.  (R. at 823, 1139, 1144.)  An examination that day found that she continued to display atrophy in her forearm, she had weakness in her finger flexors and intrinsics, and she remained weaker in her median distribution than the other C8 muscles.  (R. at

9

824.) Her sensory examination was "challenging" and non-localizing, but she had some paresthesia predominantly in the distal aspect of the thumb and index finger. (*Id.*) She also had weakness in the biceps brachii with supination and some pronation deviation with elbow flexion but otherwise good strength of her shoulder stabilizers. (*Id.*) It was noted that there was no clear demonstration of any recent worsening. (*Id.*) She was diagnosed with what was likely an "unusual presentation of idiopathic brachial plexopathy (aka Parsonage-Turner syndrome, aka neuralgic amyotrophy)." (*Id.*)

On August 1, 2018, Plaintiff was positive for a Spurling test on the left. (R. at 1122.) She received a cervical epidural steroid injection for neck and left arm pain. (R. at 1005–006, 1123–24.) On September 12, 2018, however, Plaintiff scored 5 on motor tests of her right and left elbow flexion elbow extension, hand intrinsics, wrist extrinsics, first dorsal interosseus, and abductor pollicis brevis. (R. at 1238–39.)

An examination on December 14, 2018, found that Plaintiff continued to display a mild degree of atrophy in the forearm proximal muscles on the upper left limb and had weakness in her finger flexors and intrinsics although she had stabilized or even improved with regard to her intrinsics on the left. (R. at 825–26.) She remained very weak with thumb flexion and particularly the index finger. (R. at 826.) Her sensory examination remained non-localizing and had some weakness with biceps brachii mostly with supination but displayed what appeared to be good compensation from the brachialis and relatively good elbow flexion. (*Id.*) She had good strength in the shoulder stabilizers. (*Id.*) She also had mild hypertrophy of the metacarpophalangeal joints on the right side and some significant discomfort in the first CMC joint, more on the right than left. (*Id.*) She appeared to be relatively stable from a neurological standpoint and was encouraged to proceed with a rheumatological evaluation. (*Id.*)

On February 6, 2019, Plaintiff Spurling's test was negative for arm pain. (R. at 1485.) Plaintiff scored a 5/5 in muscle strength in the upper extremity. (*Id.*)

An examination of Plaintiff's hands on March 4, 2019, found small Hebereden and Bouchard's nodes with mild hyperostosis, squaring, and mils subluxation of the first MCPs and CMCs. (R. at 1401.) An examination of her wrists revealed normal anatomy and range of motion, and no warmth swelling, or tenderness to palpitation. (*Id.*)

On April 16, 2019, Plaintiff scored a 5/5 on manual muscle testing of her bilateral upper extremities except for a 4/5 score on her left elbow flexion secondary to partial bicep avulsion. (R. at 1414.)

On June 14, 2019, an examination found that Plaintiff had some significant pain with first CMC joint grind on the right and she had a minimal amount of swelling in that area. (R. at 1517.) She had mild weakness in the left upper limb with non-localizing sensory complaints. (R. at 1518.) She had mild weakness of the left finger flexors and intrinsics but no worsening from when she had been evaluated by the same provider on December 14, 2018. (*Id.*) She remained very weak with her left thumb flexion and had more weakness in her index finger. (*Id.*) Her biceps brachii weakness, particularly with supination, was noted. (*Id.*) She was able, however, to make a full fist on the left. (*Id.*)

On June 27, 2019, Plaintiff reported left neck pain that radiated into her left and right hands. (R. at 1063.) Plaintiff acknowledged that she had not had physical therapy for the last three-to-six months. (*Id.*) An examination that day found that Plaintiff's sensation to light touch, pinprick, and vibration were normal in all four extremities. (R. at 1605.)

11

**C.     State Agency Reviewing Physicians**

State agency reviewing physician, Maureen Gallagher, D.O., reviewed Plaintiff's file at the initial level. (R. at 155–56.) Dr. Gallagher found that Plaintiff was capable of light exertional work (*i.e.*, occasionally lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds); standing and/or walking six hours in an eight-hour workday; and sitting six hours in an eight-hour workday. (R. at 155.) Dr. Gallagher further found that Plaintiff could frequently balance and occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl but that Plaintiff could never climb ladders, ropes, or scaffolds. (*Id.*) Dr. Gallagher did not, however, find that Plaintiff had any manipulative limitations. (R. at 156.)

State agency reviewer, Leon D. Hughes, M.D., reviewed Plaintiff's file at the reconsideration level and made the same findings as Dr. Gallagher except that Dr. Hughes found that Plaintiff had manipulative limitations. (R. at 169.) Specifically, Dr. Hughes found that Plaintiff was limited to frequent handling and fingering bilaterally due to her hand pain. (R. at 169.)

### IV.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V. ANALYSIS

As explained previously, Plaintiff alleges that the ALJ's RFC determination was not supported by substantial evidence because the ALJ should have found that Plaintiff had greater limitations with regard to her left upper extremity. (ECF No. 19 at 21–26.) The undersigned finds that Plaintiff's contention of error lack merit.

The determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). The Social Security Act and agency regulations require an ALJ to

13

determine a claimant's RFC based on the evidence as a whole. 42 U.S.C. §§ 423(d)(5)(B). Consistently, Social Security Ruling 96-8p instructs that the ALJ's RFC assessment must be based on all of the relevant evidence in the case record, including factors such as medical history, medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, and evidence from attempts to work. SSR 96-8P, 1996 WL 374184 (July 2, 1996). An ALJ must also explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (internal footnote omitted).

The undersigned finds that the ALJ did not err by failing to incorporate additional upper left extremity restrictions into Plaintiff's RFC. In her determination, the ALJ described in detail the medical records related to Plaintiff's left upper extremity proximal median neuropathy and right hand degenerative joint disease both before and after the alleged date of onset. (R. at 40–41.) The ALJ then explained that she accommodated those impairments by limiting Plaintiff to frequent handling and fingering bilaterally. (R. at 41.) The ALJ wrote as follows:

> [A]lthough the record has examples of the [Plaintiff] having weakness, decreased strength, and numbness in her left upper extremity, as well as testing, her symptoms stabilized. She had less deficits during physical exams. Her atrophy started off as more severe but was later diagnosed as mild. Additionally, regarding her right[-]hand impairment, she testified that she uses a cell phone, washes dishes (albeit taking longer than normal), checks social media, and manages her medication and

14

>bills, which shows an ability to use her hands. Regarding her left upper extremity, although she reported that her left thumb and index finger were entirely numb and difficult to use, at the hearing she used a cane with her left hand and during an appointment she could make a full fist with the left hand. Even though her left hand had some reduced range of motion, sensation, and strength, along with some atrophy, she was not referred to occupational or physical therapy to regain use of her left hand. The [Plaintiff]'s her bilateral hand impairments have been accommodated with a limitation to frequently handling and fingering bilaterally, as well as the limitations on hazards and climbing. Further limitations are not supported.

(*Id*.)

The ALJ's discussion demonstrates that she did not incorporate additional upper left extremity restrictions into Plaintiff's RFC, in part, because even though Plaintiff reported that her left thumb was index finger were numb and difficult to use, Plaintiff used a cane with her left hand at the hearing and was able to make a fist with her left hand. (*Id*.) Substantial evidence appears to support that determination. The ALJ noted that Plaintiff was using a cane at the hearing. (R. at 78.) Although the hearing transcript does not reflect which hand Plaintiff used to hold her cane, Plaintiff does not contest that she did so with her left hand. Moreover, the record reflects that during an examination on December 14, 2018, Plaintiff was able to make a fist with her left hand. (R. at 1518.)

The ALJ's discussion also illustrates that she did not incorporate additional upper left extremity restrictions into Plaintiff's RFC because, in part, Plaintiff's symptoms had stabilized. (*Id*.) Substantial evidence supports that determination. On July 18, 2018, Plaintiff's treating neurologist wrote that there was no clear demonstration of worsening. (R. at 824.) In addition, that same provider wrote on December 14, 2018, that Plaintiff appeared to be relatively stable from a neurological standpoint. (R. at 826.)

The ALJ's discussion also makes it clear that she declined to incorporate additional upper left extremity restriction into Plaintiff's RFC because Plaintiff had fewer deficits during

15

examinations. (R. at 41.) Substantial evidence also supports that determination. For instance, on March 15, 2018, Plaintiff had noticeably decreased supination. (R. at 818.) On March 4, 2019, however, Plaintiff had normal range of motion in her wrists. (R. at 1401.) On March 15, 2018, Plaintiff had a sensory deficit in the distal volar aspect of her left thumb. (R. at 818.) On June 27, 2019, however, Plaintiff's sensation to light touch, pinprick, and vibration was normal. (R. at 1605.) Plaintiff's Spurling tests were also positive for arm pain on September 27, and December 22, 2017, and on June 6, 2018. (R. at 471, 475, 1016.) But on February 6, 2019, Plaintiff's Spurling test was negative for arm pain. (R. at 1485.) In short, examination findings showed some improvements, or at least, a lessening of some symptom severity as time passed.

Plaintiff contends that the ALJ erred by finding that additional upper left extremity restrictions were not warranted because of Plaintiff's "Stabilization of Symptoms/Improvement in Physical Exams." (ECF No. 19, at Page ID # 1704–05.) In making this contention, Plaintiff relies on the Sixth Circuit Court of Appeals decision in *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315 (6th Cir. 2015). *Winn* is readily distinguishable. In that case, the Sixth Circuit reversed an ALJ's determination that a treating psychiatrist's opinions about a plaintiff's limitations were not entitled to controlling weight. *Id*. at 320–21. The Court found that it was error for the ALJ to rely on only "selected comments" by the treating psychiatrist to discount the psychiatrist's overall opinion where treatment notes and other evidence in the record reflected that the plaintiff could not work. *Id*. at 321–22. The Sixth Circuit concluded that in that scenario, "the ALJ's decision to discount the opinion of [the plaintiff's] treating psychiatrist was not supported by substantial evidence" and that the treating psychiatrist's "opinion was consistent with other treatment notes in the record . . . ." *Id*. at 324. In this case, however, the ALJ did not discount any physician's opinion that Plaintiff had additional upper left extremity

16

restrictions. Indeed, the only upper left extremity restriction that was opined was done so by state agency reviewing physician, Dr. Hughes, who opined that Plaintiff was limited to frequent handling and fingering bilaterally. (R. at 169.) But the ALJ incorporated into Plaintiff's RFC that very same restriction. (R. at 33.) Accordingly, Plaintiff's reliance on *Winn* is misplaced.

Plaintiff also contends that the ALJ erred by "cherry picking" Plaintiff's activities to find that her activities "were inconsistent with more significant limitations in the left arm/hand" and "neglecting to mention what Plaintiff cannot do (or do with difficulty)." (ECF No. 19, at PageID # 1707–08.) But as the discussion above makes clear, the ALJ did not rely on Plaintiff's activities to find that additional upper left extremity restrictions were unwarranted. (R. at 41.) Instead, the ALJ discussed Plaintiff's activities in connection with Plaintiff's right-hand impairment. (*Id.*) Plaintiff does not contend that the ALJ erred by failing to incorporate into her RFC additional upper right extremity restrictions—she contends only that the ALL should have incorporated more restrictions for her left side.

In any event, Plaintiff's cherry-picking contention is not well taken. Plaintiff asserts that the ALJ referenced testimony about the activities that Plaintiff can do and ignored her testimony about activities with which she has difficulties. An ALJ is not required, however, to "discuss every piece of evidence in the record to substantiate [her] decision." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2009) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)). In addition, an allegation of cherry picking is seldom successful because crediting it would require a court to re-weigh record evidence. *Delong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

17

Moreover, in this case, the ALJ did in fact discuss some of the testimony that Plaintiff accuses her of ignoring. Elsewhere in the determination, the ALJ wrote:

> During the hearing, the [Plaintiff] alleged . . . . She has a hard time using her hands due to pain, numbness, and tingling. She has trouble with activities of daily living. She cannot lift up to a gallon of milk or 5 pounds. She has trouble sleeping. She often has to use a recliner at home. She takes naps. She has fatigue and cannot complete tasks. She has a hard time focusing. She cannot do many household chores.

(R. at 34.) *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that an ALJ's determination should be read as a whole). In sum, although the ALJ did not cite every piece of testimony about Plaintiff's activities, her discussion and findings reveal that she did not cherry pick testimony that was harmful to Plaintiff and ignore that which was helpful. Instead, the ALJ considered and weighed both types of testimony and determined that Plaintiff was limited to frequent handling and fingering. Substantial evidence supports that determination. Although the helpful testimony and other record evidence may have supported more restrictions, if substantial evidence supports an ALJ's determination, that determination is given deference "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (quoting *Key*, 109 F.3d at 273).

For all these reasons, the undersigned finds that the ALJ did not commit reversible error. Plaintiff's contention of error lacks merit.

## VI.  RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's non-disability determination.

## VII.  PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or

recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                               /s/ *Chelsey M. Vascura*
                                               CHELSEY M. VASCURA
                                               UNITED STATES MAGISTRATE JUDGE